# HOWISON v. MASSON.

---

EQUITY; ADVERSE POSSESSION; CLOUD ON TITLE; APPEALS.

1. In a suit in equity to establish title by adverse possession to certain city lots cultivated by the complainant for many years as a truck garden, the evidence, claimed by the defendants to show a disclaimer of title by the complainant, was reviewed and *held* not to be sufficiently certain and exact to so show, in view of the inability of one of the witnesses relied upon to identify the person making such disclaimer with the complainant, and of the fact that the other witness testified nearly fourteen years after the alleged disclaimer, and was unsupported in his testimony by written memoranda made by him at the time.

2. Actual inclosure is not necessary to prove adverse possession, but any occupation of the property, visible and notorious, of which the property is susceptible, and which excludes the true owner from it, is sufficient. (Following *Holtzman* v. *Douglas,* 5 App. D. C. 397; *Reid* v. *Anderson,* 13 App. D. C. 30; and *Johnson* v. *Thomas,* 23 App. D. C. 141.)

3. *It would seem,* that the fact that a claimant, by adverse possession of city lots used by him for many years as a truck garden, encroached with his fence upon a public street, the lines of which were not marked,

would not prevent the fence being considered an inclosure of the lots, although he could not acquire title to the street by adverse possession.

4. The right of one of several defendants to appeal to the Supreme Court of the United States from a decree establishing a title by adverse possession of the complainant depends upon the value of his separate interest in the land, and not upon the value of the land as a whole.

No. 1695.  Submitted February 19, 1907.  Decided April 2, 1907.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia dismissing a bill in equity to establish title by adverse possession in the complainant to certain lands.                           *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree of the Supreme Court of the District of Columbia dismissing a bill of complaint filed by appellant, Robert B. Howison, as complainant, under sec. 111 of the Code [31 Stat. at L. 1207, chap. 854], to establish his title by adverse possession to lots in square No. 667 in the city of Washington.

The first and second paragraphs of the bill are not material here.  The third, fourth, and fifth are as follows:

"3. That your complainant is the owner by purchase, in his own right, in fee simple, and is now in possession of and has a good title by possession for more than twenty (20) years of lots numbered four (4) to fifteen (15), inclusive, in square numbered six hundred and sixty-seven (667), in the city of Washington, in said District of Columbia, the said lots being contiguous and all together, forming the said square, except a small portion forming the south part thereof consisting of lots one (1), two (2), three (3), and sixteen (16).

"Reference is hereby made to the plat of said square in the surveyor's office of said District.

"4. That your complainant's title was acquired, as hereinbefore stated, more than twenty years ago, and he has ever since been in the actual possession of said lots, duly inclosed by fences

and claiming the same as his own, and that all the claims of the defendants to the whole or any part of said lots arise under claims of title antedating his said acquisition of title and possession, and are solely on that ground adverse to the plaintiff's claim. That is to say, the defendants all claim title by reason of some conveyance by, under, or through persons who claimed title prior to your complainant's such adverse possession, and not otherwise, and that they are each and all of them undertaking to set up and assert claim to the whole or to certain parts of the property herein described, and his title has thereby become clouded and made so doubtful that he is unable to hold the said property quietly, or convey the same, should he so desire, to anyone else.

"5. That your complainant is in such situation, by reason of the premises, that his title, being not of record, is not such as he could make sale, if he so desired, of the said property, or of any part thereof; and it is with a view to quieting said title that he brings this suit. The premises considered, your complainant prays as follows:

"First. For a writ of subpœna commanding the defendants, and each of them, to appear and answer this bill, and in default of service thereof for an order of publication.

"Second. For a decree declaring the title of complainant in the property described in the bill to be good by adverse possession.

"Third. For such other and further relief as to the court may seem right and proper."

To this bill the several parties made answer, and, after testimony had been taken, a hearing was held which resulted in the decree appealed from.

It is undisputed that the complainant, a man sixty-seven years of age when he testified in February, 1905, has occupied the land included in his bill, together with certain lots in square No. 665, since 1861, and has each year since that time cultivated it as a truck garden. His testimony as to the circumstances under which he first obtained possession of this land is not challenged. He said he first went into possession as a tenant of one William

Fraser, to whom he paid a yearly rental of about $300; that about three years thereafter he traded for Fraser's interest in the property, letting him have in exchange a small place which complainant owned in Prince William County, Virginia, and which complainant thought worth about $500; that Fraser, however, gave him no deed or other evidence of title; that at that time, as at the time of filing his bill, the street lines were neither observed nor observable, and the tract was inclosed by a post and rail fence which projected into 1st street on the west, and, of course, inclosed that part of U street on the north between the two squares; that said rail fence was continued until about twenty years ago, when it was displaced by a wire fence, which has since been constantly maintained; that there were farm buildings on square No. 665 at the time he went into possession; that about 1863 complainant erected several shanties along Water street, on the east side of square No. 667, and within his inclosure; that a few years after this transaction with William Fraser complainant obtained from one James Fraser, a brother of said William, record title to certain lots in square No. 665, upon which were the farm buildings, for which complainant paid $5,000. In support of his testimony Mr. Howison introduced eight witnesses, seven of whom were disinterested, and one of whom was his son.

George N. Fitton, a policeman, who was raised near this land and had lived right across the way from it, testified that it had been inclosed with a fence and used by Mr. Howison as a truck garden since 1873 to his knowledge. On cross-examination witness was asked:

Q. Did he ever tell you that he owned it?

A. He told me that he owned it by having it fenced in for more than twenty years by adverse possession.

Q. By having it fenced in for twenty years by adverse possession?

A. Yes, sir.

Q. When was that?

A. I heard him speak of that fifteen years ago.

Q. You are positive of that?

A. Yes, sir.

Q. He claimed to have had a good title to it then?

A. No, sir; he said he could get a good title to it.

Q. He claimed to own it?

A. Yes, sir.

Henry Norton, a man sixty-six years old, testified he had known this property for about forty years, during which time Howison had been in possession; that the premises had been fenced in all that time; and that it was understood in the neighborhood that Howison owned the property. Witness was asked: "Has there been any time since you have known the property when that fence was not there?"—and answered, "No, sir, he had to keep it there to protect his crops,—has always been there."

Thomas J. Norris, fifty-seven years old, said he had lived in the neighborhood since he was nineteen years old, with the exception of about six years, and remembered that Howison was occupying this property when he first lived there, and has been in continuous possession since that time; that when he first knew the property there was a post and rail fence around it, and that subsequently the fence "became ragged and worn out and rotten," and a barbed-wire fence was erected in its place; and "that there was always a fence around there."

Thomas Martin, a brick-maker and seventy-four years old when he testified, stated he had lived in the vicinity of square No. 667 since 1853, and had known the property since that time; that it was then occupied by William Fraser, whom he knew "simply as the owner, who worked it;" that it was then used as a garden and inclosed with a rough fence; and that since Howison went into possession it has always been called his property.

James C. Reeves, forty-one years old, testified he had known Howison more than thirty years, and had lived in the neighborhood all his life; that the property in question had been fenced in since he could remember, first by a post and rail fence, and

later by a wire fence; and that he had worked for Howison at various times, and knew that he cultivated the land as a truck garden.

William A. Jackson, forty-one years old, testified he had lived near square No. 667 for twenty-one years, and had known of the cultivation of this land by Howison for about twenty-one years; and that it had been inclosed by a wire fence since he could remember. Witness was asked, if the fence "had been moved southward within 10 or 15 feet" within the time he had known the property, whether he would have had any means of knowing. He replied: "I would, sir, I worked for fifteen years right along there; if it had been moved I would have known something about it."

The complainant's son, Charles R. Howison, testified to the same effect.

Melville C. Hazen, a civil engineer connected with the surveyor's office of the District, testified to having made a survey of lots 4 to 15 in said square No. 667 for the purpose of locating complainant's fence. The witness identified a plat of his survey, which complainant introduced in evidence, and which showed that said fence inclosed only the north half of lot 4 and a strip 4 feet wide across the north of lot 15. Thereupon complainant's counsel made the following statement, which was entered in the record: "I wish to state that the plaintiff, in view of the survey and the testimony regarding the survey, abandons from this suit the south 28½ feet of lot 4, and all of lot 15 except the north 4 feet."

*Mr. O. B. Hallam* and *Mr. W. M. Hallam* for the appellant.

*Mr. Eugene A. Jones, Mr. Maurice D. Rosenberg, Mr. Alexander Wolf, Mr. John A. Butler, Mr. Hugh T. Taggart, Mr. Abner C. Ritchie, Mr. Henry P. Blair,* and *Mr. Corcoran Thom* for the appellees.

Mr. Justice Robb delivered the opinion of the Court:

The complainant concedes that but for his claim of adverse possession the record title of each of the defendants would be a good title.. We therefore immediately pass to a consideration of the merits of the case.

The defendants make two claims, either of which they contend is sufficient to defeat complainant's bill.

Their first contention is that Howison's occupation of the land now claimed by him was not an adverse occupation because the evidence fails to show that he ever claimed title to the land. In support of this contention the defendants rely mainly upon the testimony of Henry E. Davis, Esq., a trustee under the will of Philip Otterback, Sr., who held a tax title to lot 8 in complainant's bill, to the effect that complainant in July, 1889, made a disclaimer of title to said lot 8, and the testimony of Hugh T. Taggart, Esq., now a part owner of said lot 8 and one of the defendants, to the effect that complainant made a similar disclaimer in October, 1891.

Mr. Davis testified that he was one of three trustees under the will of Philip Otterback, Sr.; that he with his cotrustees advertised said lot 8 for sale; that on the day the sale was advertised to take place, July 9, 1889, they went to the place of sale and his "attention was at once arrested by the fact that the property in front of which the flag was flying seemed to be very much greater in area than that described in their advertisement, and he noticed that a large tract of land, including this lot" 8, was inclosed by a wire fence and under cultivation; that he directed the attention of his cotrustees and of the auctioneer to the fact that this lot was evidently in someone's possession; that he then talked with a man who was present, and who said he was in possession of the property, and who, when asked by what right he was there, said "that he had just come there, and that nobody had disturbed him; that he had not been disturbed by anyone who claimed title to any of the lots, and had not been disturbed by any of the city authorities, and that he had just stayed there, and was going to stay there until he was asked to

get off;" that it was explained to him that they were there to make sale of the property under the order of the court, and that he said "he had no title or interest in the property except as an occupant;" and that the property was thereupon offered for sale, but, only one bid being made, it was withdrawn. The witness did not even know who the man was with whom he talked; did not see him afterwards, and was unable, when he testified, to identify Mr. Howison, who was in the room, as the man with whom he had talked at the time this sale was attempted to be made. Mr. Davis further testified that, subsequent to this attempted sale, Mr. Taggart, as counsel for Dr. Louis W. Ritchie, on August 9, 1889, wrote a letter to the trustees, making an offer for the lot, which offer was accepted under authority of the court.

Mr. Taggart testified that on October 14, 1891, two years after the purchase of lot 8 by his client, Dr. Ritchie, he, accompanied by Dr. Ritchie, went to Howison's house to interview him, "as to the nature of his right, or claim of right, to the occupancy" of the lot; that they met Mr. Howison at his house, and explained the object of their visit, and that Mr. Howison thereupon said "that he made no claim to the lot at all, and that he was willing to vacate and surrender it at any time," and that he had entered into the occupation of it in 1860 or 1861. Mr. Taggart produced a memorandum, whch he used to refresh his recollection, and which he testified was made on the day he had the interview with Howison. This memorandum is as follows: "Robert B. Howison informs us that he has occupied the lot for thirty years since 1861, and has had the lot inclosed during all that time and under cultivation. He held under Otterback. The lot had been inclosed and under cultivation by William Fraser for some years. October 14, 1891." He further testified that upon the strength of this conversation Dr. Ritchie accepted a deed of the lot. At this time, however, the doctor had completed his payments for the lot, and it is interesting to note that he neglected to take a deed until May 1, 1893.

Complainant testified that he had no recollection whatever of having had any conversation with Mr. Davis on the occasion of the auction sale; that he in fact knew no one at the sale except

his neighbors and the auctioneer; that when the property was offered for sale he approached the auctioneer, and, after some preliminary conversation, stated that he had owned and occupied the property for over twenty years, and that his title was perfectly good; that "the bidding ceased right there after his statement was made." Mr. Howison was certain he did not tell Mr. Davis or anybody else that he had no title to or interest in the property except as an occupant.

James C. Reeves, who was present at the sale, testified that "there were a dozen of the neighbors or so going down; I don't know whether I was working with Mr. Howison or not. He went down, and there were five or six, maybe a dozen, people who came in a carriage, and stopped and rung a bell for a few minutes; the neighbors and us were there, and the auctioneer stood 40 feet from the fence,—maybe he stood a little more than 40 feet from the fence; Mr. Howison came over and came down there and asked the auctioneer—I don't know what he said to the auctioneer—he said that he owned that lot and had owned it for twenty years; he said 'You all can bid on it if you want to, but I claim it by adverse possession.' " When asked whether Mr. Howison made this statement publicly to the crowd, he answered: "Yes, sir, he made it publicly,—he spoke out so that they could not help hearing him, he spoke to the crowd, that I know." The complainant denied having made the statements attributed to him by Mr. Taggart, and said that on the occasion mentioned by Mr. Taggart very few words passed between them; that he is positive he said nothing about the Otterbacks, because, until the attempted auction sale, he did not know that Mr. Otterback claimed any interest in the property; that he stated to Mr. Taggart that he claimed by adverse possession, and "did not claim anything except what he had a lawful right to."

The testimony of Mr. Davis must, we think, be eliminated from consideration. He himself is unable to say that it was the complainant who made the disclaimer to lot 8. The complainant, on the other hand, emphatically denies having made any disclaimer, and does not even admit that he had any con-

versation with Mr. Davis on the occasion mentioned by Mr. Davis. The witness Reeves, an entirely disinterested witness, testifies that he heard the complainant on the same occasion publicly declare to those present that he, the complainant, had occupied the premises more than twenty years and claimed title by adverse possession. On this state of the record we are unable to say what Mr. Davis could not say, *viz.,* that it was the complainant with whom he talked.

As previously stated, Mr. Taggart's interview with complainant was had two years after his client, Dr. Ritchie, had purchased lot 8, and at a time when the last payment had been made under said purchase. His testimony was given nearly fourteen years after the conversation had taken place. However conscientious a witness may be, it is practically impossible to reproduce in his memory such an occurrence after the lapse of so great a period of time. In this instance the witness relies upon a written memorandum made at the time, but unfortunately this memorandum falls short of sustaining the material parts of his testimony. The first sentence of the statement is almost a refutation of such testimony, for it contains the statement that complainant then informed the witness that he had "occupied the lot for thirty years since 1861, and has had the lot inclosed during all that time and under cultivation." The reference in the memorandum to Otterback is altogether too vague, and lends itself to the view that it was rather a legal conclusion of the one making the memorandum, who had a knowledge of the record title, than an admission of the complainant. It will be observed that the complainant himself denied making any such statement; in fact, denied any knowledge of Otterback, and was certain that he had then, as previously, asserted his right to the property. It is unfortunate that neither Mr. Davis nor Mr. Taggart obtained from the complainant tangible written evidence of the result of their conversations with him,—assuming that it was with the complainant that Mr. Davis had his conversation at the time of the auction sale. After the lapse of so great a period of time we must require certainty and exactness if we would in effect dispossess this man, who, for more than a

generation, has tilled the land he claims, and practically lived thereon.

The facts that complainant, at the time of the Taggart interview, had occupied, inclosed and cultivated this land for thirty years; that he had paid $500 to William Fraser for his possessory title to the land; that he was generally reputed in the neighborhood to own it; that Otterback, so far as the record discloses, had never asserted any right to the property under the tax deed he held; that the testimony of Mr. Taggart is denied by the complainant,—compel us to rule that there is not sufficient evidence upon which to base a finding of disclaimer, or to estop the complainant from asserting claim to lot 8.

Holding, as we do, that the evidence in respect to lot 8 is insufficient to establish a disclaimer of title to that lot, it follows that it cannot affect the other lots included in the bill. We have carefully examined the testimony of the witness Burgdorf, and all other testimony offered by the defendants, but we fail to find therein anything materially affecting complainant's position.

The second contention of defendants is that, inasmuch as complainant did not hold under color of title, he was compelled to inclose the land claimed, and that the fence heretofore described did not constitute a legal inclosure because it encroached upon and, of course, included a portion of a public street. We think it is well settled in this jurisdiction that actual inclosure *is not* necessary to prove possession; that while inclosure is the most tangible evidence of possession, a continuous, uninterrupted, open, actual, exclusive, and adverse possession is in law equally as satisfactory. *Holtzman* v. *Douglas,* 5 App. D. C. 397; *Reid* v. *Anderson,* 13 App. D. C. 30; *Johnson* v. *Thomas,* 23 App. D. C. 141; *Ward* v. *Cochran,* 150 U. S. 597, 37 L. ed. 1195, 14 Sup. Ct. Rep. 230.

In *Holtzman* v. *Douglas,* Mr. Justice Morris, speaking for the court, said: "It is well-settled law that, for the purposes of a title by adverse possession, actual inclosure is not necessary, and that any occupation of the property, visible and notorious, of which the property is susceptible, and which excludes the true

owner from it, is sufficient. *Ellicott* v. *Pearl,* 10 Pet. 412, 9 L. ed. 475; *Ewing* v. *Burnet,* 11 Pet. 41, 9 L. ed. 624."

It is not denied that the complainant has occupied square No. 667 continuously since 1861; neither is it denied that he has each year since that date furnished abundant evidence of occupation by cultivation of every part of the square heretofore mentioned. It is not disputed that this land was in that neighborhood known as complainant's land during all these years. The complainant says, and the circumstances tend to sustain his testimony, that he has always claimed title since his trade with William Fraser. It is our opinion, therefore, that complainant is entitled to a decree, irrespective of whether this fence constituted a legal inclosure. We may say, however, that we are not impressed with the argument that because complainant encroached upon a public street, the lines of which, as heretofore stated, were not observable, his fence could not be deemed an inclosure of these lots. The object of a fence is to give tangible evidence to all the world of an occupation and adverse claim. It is a notice to everyone to keep out of the inclosure because it is occupied. We think it none the less an inclosure because it includes within it that which the one in possession cannot acquire title to by adverse possession. We think that such a fence was tangible evidence, to the holder of the record title to these lots, that Howison had fenced *in* the lots and fenced *out* the owner. Had the fence been placed right on the line, it is difficult to perceive how it could have more effectually performed its function.

The decree must be reversed, with costs, and the cause remanded, with directions to enter a decree in accordance with the bill as modified by complainant's disclaimer as to parts of lots 4 and 15, and it is so ordered.                    *Reversed.*

The appellees, on April 19, 1907, and on May 7, 1907, filed petitions for the allowance of an appeal to the Supreme Court of the United States.

The court on May 24, 1907, denied the petition, Mr. Chief Justice SHEPARD delivering the opinion of the Court:

The record shows that the several defendants below (appel-

lees here) made separate claims of title to small parts of the tract of land described in the complainant's bill.

There is nothing to indicate that the entire tract claimed by the complainants is of the value of $5,000, though it may probably be; and it seems clear, in the absence of any affirmative evidence whatsoever, that the small tract claimed by the party who petitions for the allowance of an appeal to the Supreme Court of the United States is of far less value. The right of each defendant in a suit like this to the appeal depends upon the value of his separate interest in the subject-matter, and not upon the value of the whole. *Russell* v. *Stansell*, 105 U. S. 303, 26 L. ed. 989; *Tupper* v. *Wise*, 110 U. S. 398, 28 L. ed. 189, 4 Sup. Ct. Rep. 26; *Henderson* v. *Wadsworth*, 115 U. S. 264, 271, 29 L. ed. 377, 378, 6 Sup. Ct. Rep. 140, and cases cited; *Chamberlin* v. *Browning*, 177 U. S. 605, 44 L. ed. 906, 20 Sup. Ct. Rep. 820.

The prayer for appeal must therefore be *denied*.